The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: September 22, 2023

**NO. S-1-SC-39481**

**MICHELLE LUJAN GRISHAM in her official capacity as Governor of the State of New Mexico, HOWIE MORALES, in his official capacity as New Mexico Lieutenant Governor and President of New Mexico Senate, MIMI STEWART, in her official capacity as President Pro Tempore of the New Mexico Senate, and JAVIER MARTINEZ, in his official capacity as Speaker of the New Mexico House of Representatives,**

　　　Petitioners,

v.

**HON. FRED T. VAN SOELEN, District Court Judge, Fifth Judicial District Court,**

　　　Respondent,

and

**REPUBLICAN PARTY OF NEW MEXICO, DAVID GALLEGOS, TIMOTHY JENNINGS, DINAH VARGAS , MANUEL GONZALES JR., BOBBY AND DEE ANN KIMBRO, AND PEARL GARCIA,**

Real Parties in Interest,

and

**MAGGIE TOULOUSE OLIVER**,

Defendant-Real Party in Interest.

**ORIGINAL PROCEEDING ON PETITION FOR WRIT OF SUPERINTENDING CONTROL**

Hinkle Shanor LLP
Richard E. Olson
Lucas M. Williams
Ann C. Tripp
Roswell, NM

Peifer, Hanson, Mullins & Baker, P.A.
Sara N. Sanchez
Mark T. Baker
Albuquerque, NM

UNM School of Law
Michael B. Browde
Albuquerque, NM

Stelzner, LLC
Luis G. Stelzner
Albuquerque, NM

Holly Agajanian
Kyle P. Duffy
Santa Fe, NM

for Petitioners

Dylan Kenneth Lange, General Counsel
Albuquerque, NM

for Defendant-Real Party in Interest

Harrison, Hart & Davis, LLC
Carter B. Harrison IV
Daniel J. Gallegos
Albuquerque, NM

for Real Parties in Interest

**OPINION**

**BACON, Chief Justice.**

{1}     This case presents the issue of whether a partisan gerrymandering claim is cognizable and justiciable under the Equal Protection Clause in Article II, Section 18 of the New Mexico Constitution and, if so, what standards should be applied in its adjudication. N.M. Const. art. II, § 18 ("No person shall be deprived of life, liberty or property without due process of law; *nor shall any person be denied equal protection of the laws.*" (emphasis added)). Real Parties in Interest (Real Parties)—Republican Party of New Mexico, David Gallegos, Timothy Jennings, Dinah Vargas, Manuel Gonzales Jr., Bobby and Dee Ann Kimbro, and Pearl Garcia—had filed suit as Plaintiffs in the district court, alleging that the congressional districting maps enacted in 2021 violate New Mexico's Equal Protection Clause. As Defendants in the district court, Petitioners—in their capacities as elected officials, the Governor, Lieutenant Governor-President of the Senate, President Pro Tempore of the Senate, and Speaker of the House of Representatives[1]—filed a petition for a writ of superintending control and request for stay in this Court to resolve the

---

[1]Secretary of State Maggie Toulouse Oliver, also named as a real party in interest, asserted that she is a nominal party and therefore has declined to take a position on the questions presented in this matter.

aforementioned issues. Following oral argument and supplemental briefing on those issues, we filed an order and an amended order, both of which, among other things, granted the petition insofar as declaring the justiciability of a partisan gerrymander claim and providing guidance and standards for the district court. Today, we explain that order and provide additional guidance to the district court regarding the resolution of a partisan gerrymandering case.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

{2}    Within a special legislative session in December 2021, the challenged congressional map and associated legislation was introduced in the Senate, approved by both chambers, and signed into law by the Governor.[2] In November 2021, the Citizen Redistricting Committee had submitted to the Legislature its proposed redistricting plans, promulgated in accordance with the Redistricting Act, NMSA

---

[2]Senate Bill 1, 2021 N.M. Laws, 2d Spec. Sess., ch. 2, §§ 1-5, https://www.nmlegis.gov/Legislation/Legislation?chamber=S&legType=B&legNo=1&year=21s2 (last visited Sept. 18, 2023) (choose "Final Version" and "Congress-Final Version Maps and Data" hyperlinks); *see* NMSA 1978, § 1-15-15 (2021), § 1-15-16 (2021), § 1-15-16.1 (2021), § 1-15-17 (2021), § 1-15-15.2 (2021).

1978, §§ 1-3A-1 to -9 (2021).[3] However, the Legislature exercised its discretion to draw and enact its own maps, including the challenged congressional map. *See* Senate Bill 1, "Congress-Final Version Maps and Data" hyperlink; *see also* § 1-3A-9(B) ("The legislature shall receive the adopted district plans for consideration in the same manner as for legislation recommended by interim legislative committees.").

{3}     Approximately one month after the congressional map's adoption, the Real Parties filed their lawsuit in district court challenging the map as an unconstitutional partisan gerrymander. Among other claims, the Real Parties quoted *Maestas v. Hall*, 2012-NMSC-006, ¶¶ 25, 34, 274 P.3d 66, for the proposition that "[w]hen drafters of congressional maps use 'illegitimate reasons' to discriminate against regions at the expense of others, including failing to adhere to New Mexico's 'traditional districting principles,' aggrieved voters may seek redress of this constitutional injury in the courts through an equal protection challenge." The Real Parties further alleged

---

[3]*See* Citizen Redistricting Committee, *CRC District Plans & Evaluations* (reissued Nov. 8, 2021) at 4, https://www.nmredistricting.org/wp-content/uploads/2021/11/2021-11-2-CRC-Map-Evaluations-Report-Reissued-1.pdf (last visited Sept. 8, 2023); *see also* § 1-3A-5(A)(1)(a) (providing that the committee shall "adopt three district plans each for . . . New Mexico's congressional districts"); § 1-3A-7(C)(1) (prohibiting the use of partisan data other than "to ensure that the district plan complies with applicable federal law"); § 1-3A-9(A) ("The committee shall deliver its adopted district plans . . . to the legislature by October 30, 2021, or as soon thereafter as practicable . . . .").

that the challenged map "drastically" split (or "crack[ed]")[4] the votes of registered Republicans in southeastern New Mexico from a single district (Congressional District 2) into all three congressional districts and diluted those votes by splitting registered Democrats in the greater-Albuquerque area into all three districts as well. The alleged effect was to "impose[] a severe partisan performance swing by shifting [Congressional District] 2's strong Republican block . . . into majority-Democratic seats." The Real Parties sought a declaration that the challenged map is an unconstitutional partisan gerrymander in violation of Article II, Section 18. They additionally moved for a preliminary injunction to block the map from taking effect for the 2022 congressional elections.

{4}      The Real Parties also moved for injunctive relief in asking the district court to adopt "a partisan neutral congressional map consistent with [map E]," one of the

---

[4]As expressed in the Alaska Supreme Court's *In re 2021 Redistricting Cases*:
>      Gerrymandering often takes one of two forms, "packing" or "cracking." "Packing" occurs when groups of voters of similar expected voting behavior are unnaturally concentrated in a single district; this may create a "wasted" excess of votes that otherwise might have influenced candidate selection in one or more other districts. "Cracking" occurs when like-minded voters are unnaturally divided into two or more districts; this often is done to reduce the split group's ability to elect a candidate of its choice.

528 P.3d 40, 54 (Alaska 2023) (footnotes omitted).

4

three partisan-neutral congressional plans developed by the Citizen Redistricting Committee and recommended to the Legislature.

{5} Petitioners moved to dismiss the Real Parties' lawsuit, arguing under *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), and separation-of-powers principles that the lawsuit raised a nonjusticiable political question. The district court denied the motions, reasoning that the Real Parties had alleged "a strong, well-developed case that [the challenged map] is an unlawful political gerrymander that dilutes Republican votes in congressional races in New Mexico." The district court also held that the Real Parties' partisan-gerrymandering claim was not definitively barred by *Rucho* or state law and noted that the Real Parties had cited state law authorities, namely *Maestas* and the Redistricting Act, that may provide a standard for evaluating their equal protection claim.

{6} In separate findings and conclusions, the district court denied the Real Parties' motion for preliminary injunction, concluding among other things (1) that the court likely could not grant the requested relief of adopting map E or drawing its own map, (2) that enjoining the 2021 map would cause "chaos and confusion" for the imminent primary election, and (3) that the Real Parties had not shown a "likelihood of success on the merits." In its second letter decision on the motion, the district court further explained that, because the challenged map "will be used . . . potentially for the next

5

five (5) elections, . . . the case will continue, and the Court will hear further argument at a later date on [the] complaint, that could affect the elections after 2022."

{7} Shortly after the district court filed its orders denying the motions to dismiss and for preliminary injunction, Petitioners filed the instant petition seeking a stay of proceedings and a writ of superintending control to resolve two "controlling legal issues" in the underlying suit:

> (1) Whether Article II, Section 18 . . . provides a remedy for a claim of alleged partisan gerrymandering?
> (2) Whether the issue of alleged partisan gerrymandering is a justiciable issue; and if such a claim is justiciable under the New Mexico Constitution, what standards should the district court apply in resolving that claim in this case?

This Court stayed the proceedings in the district court and heard oral arguments, following which we ordered supplemental briefing addressing whether "the New Mexico Constitution provide[s] greater protection than the United States Constitution against partisan gerrymandering." Subsequently herein we discuss the parties' arguments in these proceedings as relevant to the issues.

{8} We granted the petition and provided guidance and standards for the district court. As we discuss further herein, our guidance and standards include (1) that a partisan gerrymandering claim is justiciable under Article II, Section 18, (2) that such a claim is subject to the three-part test articulated by Justice Kagan in her dissent in *Rucho*, (3) that at this stage in the proceedings, we need not determine the

6

precise degree of partisan gerrymandering that is permissible under the New Mexico Constitution, (4) that intermediate scrutiny is the proper level of scrutiny for such a claim, and (5) what evidence must be considered of the relevant evidence that may be considered.

## II.     DISCUSSION

## A.     Our Exercise of Superintending Control and Standard of Review

{9}     "Article VI, Section 3 of the New Mexico Constitution confers on this Court superintending control over all inferior courts and the power to issue writs necessary or proper for the complete exercise of our jurisdiction and to hear and determine the same." *Kerr v. Parsons*, 2016-NMSC-028, ¶ 16, 378 P.3d 1 (text only) (citation omitted).[5] "The power of superintending control is the power to control the course of ordinary litigation in inferior courts." *Dist. Ct. of Second Jud. Dist. v. McKenna*, 1994-NMSC-102, ¶ 3, 118 N.M. 402, 881 P.2d 1387 (internal quotation marks and citation omitted). "In granting a writ of superintending control, we may offer guidance to lower courts on how to properly apply the law." *State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶ 30, 410 P.3d 201. We may exercise the power of

---

[5]The "text only" parenthetical as used herein indicates the omission of all of the following—internal quotation marks, ellipses, and brackets—that are present in the quoted source, leaving the quoted text itself otherwise unchanged.

superintending control "where it is deemed to be in the public interest to settle the question involved at the earliest moment." *Griego v. Oliver*, 2014-NMSC-003, ¶ 11, 316 P.3d 865 (internal quotation marks and citation omitted).

{10} The implications and constitutional interests of the underlying lawsuit warrant the exercise of this authority. The adjudication of a partisan gerrymandering claim is a matter of first impression that implicates both New Mexicans' constitutional right to vote and the Legislature's constitutional responsibility for redistricting. *See State ex rel. Walker v. Bridges*, 1921-NMSC-041, ¶ 8, 27 N.M. 169, 199 P. 370 ("[T]he supreme right guaranteed by the Constitution of the state is the right of a citizen to vote at public elections."); *see also* N.M. Const. art. IV, § 3(D) (identifying the Legislature as the provenance of reapportionment). We echo the district court's observation that uncertainty as to the applicable districting maps for upcoming elections could result in "chaos and confusion," further highlighting the clear and substantial public interest served by resolving the underlying legal issues here. *See McKenna*, 1994-NMSC-102, ¶ 5 ("[T]his Court has used its power of superintending control to address issues of great public interest and importance." (internal quotation marks and citation omitted)). "Because this case presents an issue of first impression . . . without clear answers under New Mexico law, . . . we agree that this is an appropriate case in which to exercise our superintending control authority." *Torrez*,

8

2018-NMSC-005, ¶ 31 (first ellipsis in original) (internal quotation marks and citation omitted).

**B.      Resolution of This Case Is Proper Under Article II, Section 18 Without Application of Interstitial Analysis**

{11}      As a preliminary matter, we determine whether the instant claim under the Equal Protection Clause of Article II, Section 18 can be resolved through interstitial analysis. For the reasons that follow, we determine that it cannot.

{12}      Under the framework for interstitial analysis announced in *State v. Gomez*, "[w]hen a litigant asserts protection under a New Mexico Constitutional provision that has a parallel or analogous provision in the United States Constitution," a state "court asks first whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined." 1997-NMSC-006, ¶¶ 19-22, 122 N.M. 777, 932 P.2d 1. Under the latter scenario, a court "may diverge from federal precedent for three reasons [or prongs]: a flawed [or undeveloped] federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Id.* ¶ 19. For purposes of this discussion, we consider the framework above to consist of two stages: the first stage consists of the initial question and answer regarding the scope of federal constitutional protection, and the second stage,

if no such protection applies, consists of determining which prong if any supports divergence from federal precedent.

{13} The applicability of *Gomez* is debated at length in the parties' supplemental briefing. The Real Parties first assert that a partisan gerrymander violates the federal equal protection standard, and they thus invite this Court to "adjudicate claims asserting the full substantive scope of the federal Equal Protection Clause." The Real Parties then assert in the alternative that each of the three *Gomez* prongs of interstitial analysis supports adjudication under Article II, Section 18; that *Rucho*'s holding establishes the relevant federal analysis to be "undeveloped" where federal courts cannot reach the merits of such a claim for prudential reasons; that structural differences exist for New Mexico, including our lack of provisions analogous to the "Cases" or "Controversies" of the United States Constitution's Article III, Section 2; and that distinctive New Mexico characteristics include "[t]his Court's [b]road[er] [c]onstruction of the [s]tate Equal Protection Clause."

{14} In response, Petitioners first reject the availability of the federal equal protection standard here, asserting that "the U.S. Supreme Court has *never* held that partisan gerrymandering violates the federal equal protection clause." Regarding the three *Gomez* prongs of interstitial analysis, Petitioners assert that none avail: that federal analysis is not *undeveloped*, given *Rucho*'s "ultimate rejection" of "th[at]

Court's political gerrymandering jurisprudence"; that no state "structural differences command departure from *Rucho*'s federal analysis," where "[r]espect for separation of powers" should constrain this Court; and that no "[s]pecial [s]tate [c]haracteristics . . . [j]ustify [d]eparture" from the federal standard. Regarding the Real Parties' assertion that this Court has construed the state Equal Protection Clause more broadly, Petitioners argue that "the State and Federal Equal Protection Clauses are coextensive, providing the same protections" (internal quotation marks and citation omitted), and that this Court has only interpreted our state Equal Protection Clause more broadly in discrete circumstances that do not apply here.

{15} Notwithstanding the parties' arguments, we determine that the instant case should be resolved under Article II, Section 18 without application of interstitial analysis. Our conclusion rests primarily on the undetermined nature of the federal Equal Protection Clause—discussed further below—as it applies to a partisan gerrymandering claim. Because that substantive matter is undetermined rather than undeveloped, we cannot answer "whether the right being asserted is protected under the federal constitution." *Gomez*, 1997-NMSC-006, ¶ 19. Importantly, the *Gomez* framework of interstitial analysis is best suited to state constitutional claims for which the relevant "federal protections are extensive and well-articulated," whereas the framework's utility is significantly diminished when federal precedent is unclear.

11

*Id.* ¶ 21 (internal quotation marks and citation omitted). Without a clear answer to that initial question of the *Gomez* framework, we do not reach the framework's second stage.

{16}     Under the plain language of *Gomez*, interstitial analysis of the instant claim under the state Equal Protection Clause *begins* by asking whether the right to vote is protected by the federal Equal Protection Clause from vote dilution effected by a partisan gerrymander—envisioning a clear, yes-or-no answer. *See* id. ¶ 19. If *yes*, "then the state constitutional claim is not reached"; if *no*, "then [Article II, Section 18] is examined." *Id.* Because *Rucho* did not address the merits of the alleged equal protection violation therein, we are left with uncertainty as to the substantive scope of the federal standard for this context,[6] and thus we lack the clear answer required

---

[6]By way of illustration, we note that, pre-*Rucho*, the United States Supreme Court recognized that invidious discrimination against *political* groups, like that against racial groups, could be cognizable under equal protection:

> What is done in so arranging for elections, or to achieve political ends or allocate political power, is not wholly exempt from judicial scrutiny under the Fourteenth Amendment. As we have indicated, for example, multimember districts may be vulnerable, if racial *or political* groups have been fenced out of the political process and their voting strength invidiously minimized.

*Gaffney v. Cummings*, 412 U.S. 735, 754 (1973) (emphasis added). However, as that proposition regarded the merits, we cannot know if the principle would be applicable by a court unbound by the federal standard of nonjusticiability announced subsequently in *Rucho*. *See* 139 S. Ct. at 2494, 2496.

by *Gomez*'s initial question. In this regard, we read *Gomez* to require clarity as to the existence of federal protection as a prerequisite to reaching the second stage of interstitial analysis. Stated differently, proceeding to the framework's second stage without such clarity would rely on speculation as to the reach of the relevant federal protection. We do not read *Gomez* to allow such speculation, and accordingly we cannot resolve the instant case under interstitial analysis.

{17}     We recognize that *Gomez* does contemplate application of interstitial analysis where the relevant federal analysis is "undeveloped," as argued by the Real Parties. *Id.* ¶ 20. However, this argument does not avail for two reasons. First, we have read *Gomez* to apply this consideration within the second stage of interstitial analysis, specifically within the first prong of "reasons to depart from established federal precedent." *State v. Adame*, 2020-NMSC-015, ¶ 14, 476 P.3d 872 (stating the first such "reason" as "the federal analysis is flawed or undeveloped"); *see also State v. Crane*, 2014-NMSC-026, ¶ 15, 329 P.3d 689. As explained, here we do not reach that second stage of the analysis.

{18}     Second, *Gomez*'s incorporation of *undeveloped* federal analysis derives from *State v. Attaway*, wherein this Court interpreted Article II, Section 10 of the New Mexico Constitution in a context not previously reached by the United States Supreme Court's interpretation of the Fourth Amendment. *Attaway*, 1994-NMSC-

011, ¶ 14, 117 N.M. 141, 870 P.2d 103 ("The [United States] Supreme Court has not determined whether officers executing a search warrant must knock and announce prior to entry."). The *Attaway* Court thus reached its holding without having to navigate an established, analogous federal standard. *See id.* ¶ 20 ("The New Mexico Constitution embodies a knock-and-announce requirement." (emphasis omitted)). In this regard, we read *Gomez*'s use of "*undeveloped* federal analogs," 1997-NMSC-006, ¶ 20 (emphasis added), to mean situations in which no United States Supreme Court standard for a federal provision exists relevant to a state court's analysis of a specific provision of the New Mexico Constitution. In contrast to the issue in *Attaway*, the issue of partisan gerrymandering under the Federal Equal Protection Clause has been debated extensively over decades by the United States Supreme Court, *see Rucho*, 139 S. Ct. at 2497-98, resulting in the uncertainty discussed above regarding the scope of the federal standard. We determine that this uncertainty is not what the *Gomez* Court envisioned by its use of "undeveloped."

{19} Further, because that uncertainty necessarily extends to the relationship of our state Equal Protection Clause to its federal analog, we deem that any ruling by this Court interpreting or relying on the unknown scope of the federal provision—regardless of the prevailing party—would be especially uncertain. In the event of subsequent federal development in this area of law, the circumstances of New

14

Mexico's ensuing congressional elections could indeed be thrown into chaos and confusion. Accordingly, we determine that exercising our constitutional "power of superintending control to address issues of great public interest and importance," *McKenna*, 1994-NMSC-102, ¶ 5 (internal quotation marks and citation omitted), warrants a ruling solely under Article II, Section 18, thus allowing the public to rely on the result.[7]

{20} Under our determination that this case cannot be resolved under interstitial analysis, we need not further address the parties' arguments in this regard.

## C. A Partisan Gerrymandering Claim Is Justiciable Under Article II, Section 18

{21} Citing *Rucho*, 139 S. Ct. at 2494, Petitioners argue that this Court should hold a partisan gerrymandering claim to be nonjusticiable, that is, not "capable of being

---

[7]We take note of Justice Bosson's observations that "*Gomez* is not inscribed in granite; it is not part of the state Constitution. It is merely a means to an end . . . [intended to] serve[] the purposes of justice and an independent development of our state Constitution." *State v. Garcia*, 2009-NMSC-046, ¶ 56, 147 N.M. 134, 217 P.3d 1032 (Bosson, J., specially concurring). We agree that *Gomez* does not bind this Court as to our analysis of state constitutional questions, and we encourage thoughtful and reasoned argument in the future addressing whether the interstitial approach is the proper method to ensure the people of New Mexico the protections promised by their constitution. *Cf.* Jeffery S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law*, 174, Oxford Univ. Press (2018) ("[A] chronic underappreciation of state constitutional law has been hurtful to state *and* federal law and the proper balance between state *and* federal courts in protecting individual liberty.").

disposed of judicially." *Justiciable*, *Black's Law Dictionary* (11th ed. 2019). Petitioners assert that separation of powers principles are offended by adjudication of such "fundamentally political dispute[s]"; that the New Mexico Equal Protection Clause is "coextensive" with its federal analog, and thus additional state constitutional or statutory guideposts are necessary for adjudication under Article II, Section 18; and that political question doctrine precludes the justiciability of a partisan gerrymandering claim. Implicitly, these arguments suggest that concerns regarding federal standards of justiciability should override state judicial concerns regarding constitutional violations of equal protection and, consequently, that a partisan gerrymandering claim under Article II, Section 18 is excepted from judicial review. We disagree.

**1.      The right to vote is of paramount importance in New Mexico**

{22}    At the outset, we emphasize that "[t]he right to vote is the essence of our country's democracy, and therefore the dilution of that right strikes at the heart of representative government." *Maestas*, 2012-NMSC-006, ¶ 1; *see State ex rel. League of Women Voters of N.M. v. Advisory Comm. to N.M. Compilation Comm'n*, 2017-NMSC-025, ¶ 1, 401 P.3d 734 ("[T]he elective franchise . . . is among the most precious rights in a democracy."). In *State ex rel. League of Women Voters v. Herrera*, we "reiterat[ed] the longstanding and fundamental principle that the right

to vote is of paramount importance. The courts of New Mexico have long held that in service of this important right, courts should guard against voter disenfranchisement whenever possible and interpret statutes broadly to favor the right to vote." 2009-NMSC-003, ¶ 8, 145 N.M. 563, 203 P.3d 94 (citations omitted). We have further identified voting as "a fundamental personal right or civil liberty . . . which the Constitution explicitly or implicitly guarantees." *Marrujo v. N.M. State Highway Transp. Dep't*, 1994-NMSC-116, ¶ 10, 118 N.M. 753, 887 P.2d 747.

{23} In addition, we recognize that other provisions in our state Bill of Rights—specifically Article II, Sections 2, 3, and 8—support that the right to vote is of paramount importance in New Mexico. Article II, Section 2 (Popular Sovereignty Clause) provides, "All political power is vested in and derived from the people: all government of right originates with the people, is founded upon their will and is instituted solely for their good." Article II, Section 3 (Right of Self-Government Clause) provides, "The people of the state have the sole and exclusive right to govern themselves as a free, sovereign and independent state." Article II, Section 8 (Freedom of Elections Clause) provides, "All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." As we discuss herein, we determine that the right to vote is intrinsic to the guarantees embodied in these provisions of our state Bill of Rights.

17

{24}     We begin this discussion with our Freedom of Elections Clause, which we have also characterized as our Free and Open Clause. *See, e.g.*, *Crum v. Duran*, 2017-NMSC-013, ¶ 2, 390 P.3d 971. By its plain language, the Clause implicitly asserts the importance of "the free exercise of the right of suffrage." N.M. Const. art. II, § 8. We have characterized the Freedom of Elections Clause as "intended to promote voter participation during elections" and as "Provid[ing] a Broad Protection of the Right to Vote." *Crum*, 2017-NMSC-013, ¶¶ 2-6; *see also Gunaji v. Macias*, 2001-NMSC-028, ¶ 29, 130 N.M. 734, 31 P.3d 1008 ("[A]n election is only 'free and [open]' if the ballot allows the voter to choose between the lawful candidates for that office."). In *Crum*, we further noted with approval the Missouri Supreme Court's interpretation of that state's "substantively identical" provision "to mean that 'every qualified voter may freely exercise the right to vote without restraint or coercion of any kind and that his or her vote, when cast, shall have the same influence as that of any other voter." *Id.*, 2017-NMSC-013, ¶ 9 (text only) (quoting *Preisler v. Calcaterra*, 243 S.W.2d 62, 64 (Mo. 1951) (en banc)).

{25}     While we have not had prior occasion to construe either our Popular Sovereignty Clause or our Right of Self-Government Clause, we determine that Article II, Sections 2 and 3 by their plain language are constitutional provisions articulating the sovereignty of the people over their government, which sovereignty

18

under our system of representative democracy is ensured by the right to vote. These two provisions—which have no federal analog—underscore the importance of the franchise to effectuating the other rights guaranteed by the New Mexico Constitution. To that extent, we agree with the Real Parties that we "should construe the Equal Protection Clause's application here *in par*[*i*] *materia* or through the 'prism' of [these] other Bill of Rights provisions that also speak directly to the right to fair electoral representation." *Cf. Herrera*, 2009-NMSC-003, ¶ 8 ("[T]he right to vote is of paramount importance."); *Walker*, 1921-NMSC-041, ¶ 8 ("[T]he supreme right guaranteed by the Constitution of the state is the right of a citizen to vote at public elections."); *Hannett v. Jones*, 1986-NMSC-047, ¶ 13, 104 N.M. 392, 722 P.2d 643 (recognizing "the principle that constitutions must be construed so that no part is rendered surplusage or superfluous"); *State v. Gutierrez*, 1993-NMSC-062, ¶ 55, 116 N.M. 431, 863 P.2d 1052 ("Surely, the framers of the Bill of Rights of the New Mexico Constitution meant to create more than 'a code of ethics under an honor system.'" (quoting Potter Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases*, 83 Colum. L. Rev. 1365, 1369-72 (1983))).

{26}     We need not determine here whether these broad constitutional provisions are merely "meant to express . . . basic political principle[s]" or are meant "as a textual

enumeration of certain substantive rights." Marshall J. Ray, *What Does the Natural Rights Clause Mean to New Mexico?*, 39 N.M. L. Rev. 375, 399, 403 (2009) (discussing the New Mexico Constitution Article II, Section 4). The right to vote *is* the essential democratic mechanism intrinsic to these provisions that links the people to their guaranteed power and rights. We therefore read Article II, Section 18 together with Sections 2, 3, and 8 to evaluate an individual's right to vote under the New Mexico Constitution.

**2.    Vote dilution can rise to a level of constitutional harm for which Article II, Section 18 provides a remedy**

{27}    In the seminal case of *Reynolds v. Sims*, the United States Supreme Court stated in the one-person, one-vote context that the "federally protected right suffers substantial dilution where a favored group has full voting strength and the groups not in favor have their votes discounted." 377 U.S. 533, 555 n.29 (1964) (text only) (citation omitted); *see Maestas*, 2012-NMSC-006, ¶ 1. In reliance on *Reynolds*, this Court has recognized constitutional harm where the individual right to vote is infringed, including through debasement or dilution. *Wilson v. Denver*, 1998-NMSC-016, ¶ 27, 125 N.M. 308, 961 P.2d 153 ("'[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" (quoting *Reynolds*, 377 U.S. at 555)); *see also State ex rel. Witt v. State Canvassing Bd.*, 1968-NMSC-017,

20

¶ 22, 78 N.M. 682, 437 P.2d 143 ("'To the extent that a citizen's right to vote is debased, [that individual] is that much less a citizen.'" (quoting *Reynolds*, 377 U.S. at 567)).

{28} A partisan gerrymander by its very nature results in vote dilution. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015) (defining "the problem of partisan gerrymandering" as "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power"); *cf. Vieth v. Jubelirer*, 541 U.S. 267, 274-75 (2004) (recognizing a historical gerrymander as a political party's "'attempt to gain power which was not proportionate to its numerical strength'" (citation omitted)). Just five years ago, a unanimous United States Supreme Court agreed that the "harm" of vote dilution "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked[8]—to carry less weight than it would carry in another, hypothetical district." *Gill v. Whitford*, 138 S. Ct. 1916, 1930–31 (2018).

---

[8]As described by Justice Kagan,

> Partisan gerrymandering operates through vote dilution—the devaluation of one citizen's vote as compared to others. A mapmaker draws district lines to "pack" and "crack" voters likely to support the disfavored party. He packs supermajorities of those voters into a relatively few districts, in numbers far greater than needed for their preferred candidates to prevail. Then he cracks the rest across many more districts, spreading them so thin that their candidates will not be able to win. Whether the person is packed or cracked, his vote carries

{29} However, some degree of vote dilution under a partisan gerrymander does not offend the United States Constitution. *See Rucho*, 139 S. Ct. at 2497 ("[W]hile it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting, a jurisdiction may engage in constitutional political gerrymandering." (internal quotation marks and citation omitted)); *see also Gaffney*, 412 U.S. at 753 ("Politics and political considerations are inseparable from districting and apportionment."). Stated differently, depending on the degree of vote dilution under a political gerrymander, it may not rise to the level of constitutional harm.

{30} Although some degree of partisan gerrymander is permissible, *egregious* partisan gerrymandering can effect vote dilution to a degree that denies individuals their "inalienable right to full and effective participation in the political process[]," *Reynolds*, 377 U.S. at 565, and "enable[s] politicians to entrench themselves in office

---

less weight—has less consequence—than it would under a neutrally drawn (non-partisan) map. In short, the mapmaker has made some votes count for less, because they are likely to go for the other party.

*Rucho*, 139 S. Ct. at 2513-14 (Kagen, J., dissenting) (citations omitted).

as against voters' preferences," *Rucho*, 139 S. Ct. at 2509 (Kagan, J., dissenting).[9] The consequences of such entrenchment under a partisan gerrymander include that ensuing elections are effectively predetermined, essentially removing the remedy of the franchise from a class of individuals whose votes have been diluted.

{31} To allow such a result would be an abdication of our duty to "apply the protections of the Constitution" when the government is alleged to have threatened the constitutional rights that all New Mexicans enjoy; accordingly, we would be derelict in our responsibility to vindicate constitutional protections, including the equal protection guarantee, were we to deny a judicial remedy to individuals directly affected by such a degree of vote dilution. *See Griego*, 2014-NMSC-003, ¶ 1 ("[W]hen litigants allege that the government has unconstitutionally interfered with a right protected by the Bill of Rights, or has unconstitutionally discriminated against them, courts must decide the merits of the allegation. If proven, courts must

---

[9]We note that the dangers for democracy of such gerrymanders are recognized in *Rucho* by both the majority and the dissent. *See Rucho*, 139 S. Ct. at 2506 (the majority recognizing that "[e]xcessive partisanship in districting leads to results that reasonably seem unjust" as well as "the fact that such gerrymandering is 'incompatible with democratic principles'" (quoting *Ariz. State Legislature*, 576 U.S. at 791)); *id.* at 2507 ("Our conclusion does not condone excessive partisan gerrymandering."); *id.* at 2509 (Kagan, J., dissenting) ("The partisan gerrymanders in these cases deprived citizens of the most fundamental of their constitutional rights[.] . . . If left unchecked, gerrymanders like the ones here may irreparably damage our system of government.").

safeguard constitutional rights and order an end to the discriminatory treatment."); *see also Walker*, 1921-NMSC-041, ¶ 8; *cf. Gill*, 138 S. Ct. at 1930-31 ("Remedying the individual voter's harm [of vote dilution] . . . requires revising only such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be.").

{32} Similarly, we fail to see how all political power would be "vested in and derived from the people" and how "all government of right [would] originate[] with the people" and be "founded upon their will," as required by the Popular Sovereignty Clause, if the will of an entrenched political party were to supersede the will of New Mexicans. N.M. Const. art, II § 2. In such a scenario, the will of the people would come second to the will of the entrenched party, and the fundamental right to vote in a free and open election as required by Article II, Section 8 of the New Mexico Constitution would be transformed into a meaningless exercise. *See* N.M. Const. art. II § 8 ("All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."). Such a result cannot stand.

{33} We reiterate and emphasize that although we refer to federal cases for the purpose of guidance, such cases do not compel our result. Rather, our opinion is separately, adequately, and independently based upon the protections provided by

the New Mexico Constitution. *See* N.M. Const. art. II, § 18; *id.* § 3 ("The people of the state have the sole and exclusive right to govern themselves as a free, sovereign and independent state."); *see also Michigan v. Long*, 463 U.S. 1032, 1041 (1983) ("If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached. In this way, both justice and judicial administration will be greatly improved. If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision.").

{34} We conclude that a partisan gerrymander of an egregious degree violates the democratic principles expressed above in the New Mexico Constitution and our precedent through disparate treatment of a class of voters and thus is cognizable under Article II, Section 18. *See Breen v. Carlsbad Mun. Schs.*, 2005-NMSC-028, ¶ 19, 138 N.M. 331, 120 P.3d 413 ("[A] politically powerless group has no independent means to protect its constitutional rights."). Given the consequences of entrenchment, we reiterate that denial of a judicial remedy to individuals directly

affected by such a degree of vote dilution would be a dereliction of our responsibility to vindicate constitutional protections, including the equal protection guarantee.

**3.    A partisan gerrymandering claim under Article II, Section 18 is not excepted from judicial review**

{35}    In accordance with our foregoing conclusions on the New Mexico Constitution, we next address Petitioners' arguments that a partisan gerrymandering claim should be excepted from judicial review.

{36}    As a general proposition under separation of powers principles, this Court conducts judicial review of legislation alleged to commit constitutional harm. *State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque*, 1994-NMSC-126, ¶ 15, 119 N.M. 150, 889 P.2d 185 ("The reviewability of executive and legislative acts is implicit and inherent in the common law and in the division of powers between the three branches of government."). The judiciary's proper "function and duty [is] to say what the law is and what the Constitution means." *Dillon v. King*, 1974-NMSC-096, ¶ 28, 87 N.M. 79, 529 P.2d 745 (*citing Marbury v. Madison*, 5 U.S. 137, 178 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.")); *United States v. Nixon*, 418 U.S. 683, 703 (1974) (same); *see* N.M. Const. art. III, § 1. "[T]he primary responsibility for enforcing the Constitution's limits on government, at least since the time of *Marbury v. Madison*, . . . has been vested in the judicial branch." *Gutierrez*, 1993-NMSC-062,

26

¶ 55 (internal quotation marks and citation omitted); *see Moore v. Harper*, 143 S. Ct. 2065, 2079 (2023) ("Since early in our Nation's history, courts have recognized their duty to evaluate the constitutionality of legislative acts."). "When government is alleged to have threatened any of [the provisions in the New Mexico Bill of R]ights, it is the responsibility of the courts to interpret and apply the protections of the Constitution." *Griego*, 2014-NMSC-003, ¶ 1.

{37} However, in conducting such review,

> "[w]e will not question the wisdom, policy, or justness of a statute, and the burden of establishing that the statute is invalid rests on the party challenging the constitutionality of the statute. An act of the Legislature will not be declared unconstitutional in a doubtful case, . . . and if possible, it will be so construed as to uphold it."

*Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037, ¶ 11, 306 P.3d 457 (alteration and omission in original) (citation omitted); *cf. Pirtle v. Legis. Council Comm.*, 2021-NMSC-026, ¶ 32, 492 P.3d 586 (""[I]t is only when a legislative body adopts internal procedures that 'ignore constitutional restraints or violate fundamental rights' that a court can and must become involved." (quoting *United States v. Ballin*, 144 U.S. 1, 5 (1892))).

**a.  Judicial review of a partisan gerrymander does not offend separation of powers principles**

{38} To the extent that Petitioners assert that judicial review of redistricting "do[es] violence to New Mexico's constitutional separation of powers," we reject such a

27

blanket proposition. We agree with Petitioners that "th[is] Court should not interject itself into this fundamentally political dispute *to impose its own policy preference* as to just how 'fair' maps need to be" (emphasis added). To conduct judicial review with such a purpose would contradict the judicial limitation expressed above in *Bounds*. Our proper role, here as in conducting judicial review of legislation generally, is determining whether the acts of the political branches have exceeded constitutional authority. *See Rodriguez v. Brand West Dairy*, 2016-NMSC-029, ¶ 2, 378 P.3d 13 ("When litigants allege that the government has unconstitutionally discriminated against them, courts must decide the merits of the allegation because if proven, courts must resist shrinking from their responsibilities as an independent branch of government, and refuse to perpetuate the discrimination . . . by safeguarding constitutional rights. Such is the constitutional responsibility of the courts."); *see also Moore*, 143 S. Ct. at 2083 ("[W]hen legislatures make laws, they are bound by the provisions of the very documents that give them life."). The fact that the results of adjudication in a partisan gerrymandering case, as Petitioners assert, "*will*—not maybe—favor one political party over [an]other" reflects the

nature of the case, not judicial policymaking.[10] *Cf. Rucho*, 139 S. Ct. at 2519-23 (Kagan, J., dissenting) (analyzing that "judicial oversight of partisan gerrymandering" by the lower courts there "us[ed] neutral and manageable—and eminently legal—standards").

{39}     We will leave no power on the table in properly fulfilling our constitutional obligations, including to vindicate individual rights. As we explained in *Griego*, when the "government is alleged to have threatened" rights such as equal protection of the law and the right to vote, "it is the responsibility of the courts to interpret and apply the protections of the Constitution" to both safeguard individual rights and put an end to the discriminatory treatment. 2014-NMSC-003, ¶ 1. *See Reynolds*, 377 U.S. at 566 ("We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally

---

[10]We note the *Rucho* majority's public perception concern that, without "especially clear standards," "intervening courts—even when proceeding with best intentions—would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust." 139 S. Ct. at 2498 (internal quotation marks and citation omitted). However, we find no explanation in *Rucho* for how such risk is distinct from that borne by courts in numerous other contexts under their constitutional mandate to interpret the laws. We also note and affirm the dissent's full agreement that "[j]udges should not be apportioning political power based on their own vision of electoral fairness, whether proportional representation or any other." *Id.* at 2515 (Kagen, J., dissenting).

protected rights demands judicial protection; our oath and our office require no less of us.").

**b.    New Mexico's Equal Protection Clause should not be read as coextensive with the federal Equal Protection Clause for purposes of a partisan gerrymandering claim**

{40}    Petitioners further assert that the instant case is nonjusticiable because the New Mexico Equal Protection Clause is coextensive with its federal counterpart and the additional requisite "standards and guidance" identified in *Rucho* for justiciability do not exist in New Mexico law.

{41}    Petitioners' view of the state Equal Protection Clause does not square with our precedent. As Petitioners recognize, we have interpreted Article II, Section 18 as providing broader protection than the Fourteenth Amendment in other contexts.

{42}    In *Griego*, we held that "[d]enying same-gender couples the right to marry and thus depriving them and their families of the rights, protections, and responsibilities of civil marriage violates the equality demanded by the Equal Protection Clause of the New Mexico Constitution." 2014-NMSC-003, ¶ 68. In *Breen*, we stated,

> [T]he Equal Protection Clause of the New Mexico Constitution affords "rights and protections" independent of the United States Constitution. While we take guidance from the Equal Protection Clause of the United States Constitution and the federal courts' interpretation of it, we will nonetheless interpret the New Mexico Constitution's Equal Protection Clause independently when appropriate. . . . Federal case law is

30

certainly informative, but only to the extent it is persuasive. In analyzing equal protection guarantees, we have looked to federal case law for the basic definitions for the three-tiered approach [regarding the level of scrutiny to apply to legislation], but we have applied those definitions to different groups and rights than the federal courts.

2005-NMSC-028, ¶ 14 (citations omitted); *id.* ¶ 50 (holding that certain provisions of the Workers' Compensation Act "violate equal protection by discriminating against the mentally disabled in violation of equal protection guarantees").

{43} Petitioners attempt to confine *Griego* and *Breen* as cases wherein we have "invoked Article II, Section 18's Equal Protection Clause as providing greater protection of civil rights only to protect against historical, invidious and purposeful discrimination against a discrete group of vulnerable plaintiffs." Petitioners also note that in both cases we "pointed to the enaction of legislation protecting the very same class of plaintiffs." *See Griego*, 2014-NMSC-003, ¶ 48 (citing recent legislation prohibiting discrimination and profiling based on sexual orientation and "add[ing] sexual orientation as a protected class under hate crimes legislation"); *Breen*, 2005-NMSC-028, ¶ 27 ("protecting the mentally disabled against possible discrimination" by statutorily defining the "'least drastic means principle'"). However, nothing in *Griego* or *Breen* expresses that these features identified by Petitioners were necessary to our finding broader "rights and protections" under Article II, Section 18. Given the constitutional importance of the right to vote, as discussed above, we

31

reject any suggestion that an absence of these features negates protection under our state Equal Protection Clause.

{44} Petitioners also argue that, due to the provisions' textual similarity, "[u]nsurprisingly, New Mexico courts have repeatedly held that the State and Federal Equal Protection Clauses are coextensive, providing the same protections" (internal quotation marks and citation omitted). We note, however, that Petitioners do not cite this Court's cases for their proposition regarding equal protection. Instead, Petitioners cite two New Mexico Court of Appeals cases and one federal district court case that itself cites a third New Mexico Court of Appeals case. *See E. Spire Commc'ns, Inc. v. Baca*, 269 F. Supp. 2d 1310, 1323 (D.N.M. 2003) (citing *Valdez v. Wal-Mart Stores, Inc.,* 1998-NMCA-030, ¶ 6, 124 N.M. 655, 954 P.2d 87); *Mieras v. Dyncorp*, 1996-NMCA-095, ¶ 16, 122 N.M. 401, 925 P.2d 518; *Garcia v. Albuquerque Pub. Sch.s Bd. of Educ.*, 1980-NMCA-081, ¶ 4, 95 N.M. 391, 622 P.2d 699. The Real Parties in reply make the apt observation that the cited Court of Appeals cases predate *Breen* and *Griego*. Without more, these citations therefore do not support Petitioners' argument.

{45} Because Article II, Section 18 should not be read as coextensive with the Fourteenth Amendment in this context, we do not accept Petitioners' premise that, to the extent the federal Equal Protection Clause may be read to lack standards

supporting justiciability of a partisan gerrymander, the New Mexico Equal Protection Clause does as well. Our rejection of the premise is bolstered by the undetermined nature of the substantive scope of the federal Equal Protection Clause. Accordingly, we reject the assertion that New Mexico law lacks adequate standards and guidance, a point that we address more fully subsequently herein by setting out the applicable equal protection test.

{46}   Notwithstanding our conclusion, we concur with Petitioners' argument that neither *Maestas* nor the Redistricting Act is a source of redistricting standards that bind the Legislature. Quoting *Rucho* and *Maestas*, the Real Parties point to "traditional districting principles" (*Maestas*, 2012-NMSC-006, ¶ 34) and the Redistricting Act as supplying "standards and guidance for state courts to apply" (*Rucho*, 139 S. Ct. at 2507). *Maestas*, however, only mandates the use of "traditional districting principles" for *court*-drawn plans when the political branches have failed to reach agreement. *Maestas*, 2012-NMSC-006, ¶¶ 31, 34. It says nothing about whether the *Legislature* is bound by such principles in the political redistricting process. *See, e.g., id.* ¶ 34 ("These guidelines . . . should be considered by a state court when called upon to draw a redistricting map."). Significantly, the *Maestas* Court was careful to describe these principles as "guidelines that are relevant to state districts," not as binding requirements that provide a constitutional basis for striking

33

down a duly enacted district map. *Id.* The Redistricting Act, although requiring the Citizen Redistricting Committee to prepare and submit nonpartisan redistricting plans to the Legislature, specifies that those plans are merely recommendations which the Legislature is not required to follow. *See* § 1-3A-9(B) ("The legislature shall receive the adopted district plans for consideration in the same manner as for legislation *recommended* by interim legislative committees." (emphasis added)). Thus, the Real Parties' reliance on the traditional redistricting principles in *Maestas* and the Redistricting Act as standards to satisfy *Rucho* is misplaced.

**c.      Political question doctrine is nonbinding and does not avail**

{47}      Petitioners also assert that this Court should follow "the holding and rationale of *Rucho*" when, Petitioners allege, "[t]here is no means for the Judiciary to supply

a clear and discernable standard."[11] *See Rucho*, 139 S. Ct. at 2494 ("Among the political question cases the [United States Supreme] Court has identified are those that lack 'judicially discoverable and manageable standards for resolving [them].'" (second alteration in original) (quoting *Baker*, 369 U.S. at 217)).

[11]Though not an ingredient of our conclusion here, we note that the formulation of the political question doctrine urged by Petitioners involves a bright-line approach to political questions being nonjusticiable, as followed by the supreme courts of Kansas and North Carolina. *See Rivera v. Schwab*, 512 P.3d 168, 185 (Kan. 2022); *Harper v. Hall*, 886 S.E.2d 393, 399 (N.C. 2023). Instead, we interpret the seminal political question cases of *Baker v. Carr* and *Marbury* as requiring a case-by-case analysis, *Baker*, 369 U.S. 186, 210-11 (1962) ("Much confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry. Deciding . . . whether the action of [another] branch exceeds whatever authority has been committed[] is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution."); *id.* at 217 ("The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing."), that excepts a political question from nonjusticiability where the case involves vindication of individual rights, *see Marbury*, 5 U.S. at 166 ("[T]here exists, and can exist, no power to control [executive] discretion [where t]he subjects [of an executive officer's acts] are political. They respect the nation, *not individual rights, and . . . when the rights of individuals are dependent on the performance of* [*such an executive officer's*] *acts*[,] *he . . . is amenable to the laws for his conduct*[] *and cannot at his discretion sport away the vested rights of others. . . . But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured*[] *has a right to resort to the laws of his country for a remedy*." (emphasis added)).

{48} The political question doctrine as applied in *Rucho* binds federal courts through Article III, Section 2 of the United States Constitution, whereas "the New Mexico Constitution does not expressly impose a [parallel] 'cases or controversies' limitation on state courts." *New Energy Economy, Inc. v. Shoobridge*, 2010-NMSC-049, ¶ 16, 149 N.M. 42, 243 P.3d 746. Notwithstanding their nonbinding status, we have stated that prudential considerations should guide this Court's discretion in the context of conferring standing, *N.M. Right to Choose/NARAL v. Johnson,* 1999-NMSC-005, ¶ 13, 126 N.M. 788, 975 P.2d 841, and we have noted that "'prudential rules' of judicial self-governance, like standing, ripeness, and mootness, are 'founded in concern about the proper—and properly limited—role of courts in a democratic society' and are always relevant concerns," *Shoobridge*, 2010-NMSC-049, ¶ 16 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). In other words, federal prudential standards—including the political question doctrine—are relevant here but are merely persuasive, a point that Petitioners acknowledge.

{49} Because the federal prudential standard is merely a persuasive consideration instead of a requirement, the question for this Court is limited to whether our constitutional responsibility to vindicate the individual right claimed in this case under Article II, Section 18 outweighs relevant prudential concerns regarding the adjudicatory standards to be applied. Further, our Constitution contains provisions

that *Rucho* did not consider, provisions with no federal counterpart. *See* N.M. Const. art. II, §§ 2, 3, and 8. Given the importance of the right to vote, and the manageable standards to be applied under our own constitution discussed below, we conclude that the constitutional concerns here outweigh the prudential concerns. We hold that a partisan gerrymander claim is justiciable under Article II, Section 18 of the New Mexico Constitution.

**D.  A Partisan Gerrymandering Claim Under Article II, Section 18 Is Subject to the Three-Part Test Articulated by Justice Kagan in Her *Rucho* Dissent**

{50}  For an equal protection claim asserting a partisan gerrymander under Article II, Section 18, we adopt the three-part test articulated by Justice Kagan in her *Rucho* dissent:

> As many legal standards do, that test has three parts: (1) intent; (2) effects; and (3) causation. First, the plaintiffs challenging a districting plan must prove that state officials' predominant purpose in drawing a district's lines was to entrench their party in power by diluting the votes of citizens favoring its rival. Second, the plaintiffs must establish that the lines drawn in fact have the intended effect by substantially diluting their votes. And third, if the plaintiffs make those showings, the State must come up with a legitimate, non-partisan justification to save its map.

139 S. Ct. at 2516 (Kagan, J., dissenting) (text only) (citations omitted).

{51}  This test fits within our existing equal protection framework. "The threshold question in analyzing all equal protection challenges is whether the legislation

37

creates a class of similarly situated individuals who are treated dissimilarly." *Breen*, 2005-NMSC-028, ¶ 10. Where the evidence in a partisan gerrymandering claim satisfies this threshold question, the district court should then apply the Kagan test to determine whether the disparate treatment of vote dilution rises to the level of an egregious gerrymander. As discussed above, the touchstone of an egregious partisan gerrymander under Article II, Section 18 is political entrenchment through intentional dilution of individuals' votes, and the Kagan test serves to determine whether the disparate treatment in an alleged gerrymander rises to such a level. *See* N.M. Const. art. II, § 2 (providing that our Popular Sovereignty Clause vests *all* political power in, and derives all power from the people, rather than a particular party engaging in allegedly egregious gerrymandering); *id.* § 8 (requiring that "[a]ll elections . . . be free and open"). We find it inconceivable that the framers of our constitution would consider an election in which the entrenched party effectively predetermined the result to be an election that is "free and open."

{52}  In *Rucho*, the dissent provides relevant discussion of the purpose and scope of this test and of the lower courts' standards on which it is based. *See generally*, 139 S. Ct. at 2509-25 (Kagen, J., dissenting); *id.* at 2513 (Kagen, J., dissenting) ("Partisan gerrymandering of the kind before us . . . subverts democracy . . . [and] violates individuals' constitutional rights."). On the one hand,

courts across the country, including those below, have coalesced around manageable judicial standards to resolve partisan gerrymandering claims. Those standards satisfy the majority's own benchmarks. They do not require—indeed, they do not permit—courts to rely on their own ideas of electoral fairness, whether proportional representation or any other. And they limit courts to correcting only egregious gerrymanders, so judges do not become omnipresent players in the political process. But yes, the standards used here do allow—as well they should—judicial intervention in the worst-of-the-worst cases of democratic subversion, causing blatant constitutional harms. In other words, they allow courts to undo partisan gerrymanders of the kind we face today from North Carolina and Maryland.

*Id.* at 2509 (Kagen, J., dissenting). On the other hand, we agree and caution that

[j]udges should not be apportioning political power based on their own vision of electoral fairness, whether proportional representation or any other. And judges should not be striking down maps left, right, and center, on the view that every smidgen of politics is a smidgen too much. Respect for state legislative processes—and restraint in the exercise of judicial authority—counsels intervention in only egregious cases.

*Id.* at 2515-16 (Kagen, J., dissenting) (concurring in the majority's identification of "some dangers everyone should want to avoid"). We emphasize that "by requiring plaintiffs to make difficult showings relating to both purpose and effects, the standard [in the Kagan test] invalidates the most [egregious], but only the most [egregious], partisan gerrymanders." *Id.* at 2516 (Kagen, J., dissenting).

39

**E.    So Long as the Degree Is Not Egregious in Intent and Effect, We Need Not Determine at This Stage of the Proceedings the Precise Minimum Degree That Is Impermissible Under Article II, Section 18**

{53}    Our ruling on the petition for extraordinary writ resolves pure questions of law and comes before any record has been developed in the district court. At this stage in the proceedings, we conclude that we need not determine the precise minimum degree of partisan gerrymander that would constitute an egregious partisan gerrymander.

{54}    We recognize the concerns raised in *Rucho*, albeit under the rubric of justiciability analysis, regarding the difficulty of "provid[ing] a standard for deciding how much partisan dominance is too much." *Rucho*, 139 S. Ct. at 2498 (internal quotation marks and citation omitted) ("[T]he question is one of degree."). However, we conclude that those concerns are outweighed by the constitutional harm effected by an egregious partisan gerrymander. To withhold relief for such harm would illogically render the political branches' *most* egregious violations of equal protection immune to judicial review by virtue of there being *less* egregious partisan gerrymanders which are hard to assess, which would be contrary to Article II, Sections 2, 3, and 8 of our New Mexico Constitution.

{55}    Our duty to vindicate individual rights outweighs any prudential concern that the minimum degree of constitutional harm under an egregious partisan gerrymander

40

is difficult to specify. We find such a concern assuaged by the fact that plaintiffs in such cases will bear the burden to establish that the evidence places defendants' actions within the range of constitutional harm, and by our own prudential directive in *Bounds*: "An act of the Legislature will not be declared unconstitutional in a doubtful case, and if possible, it will be so construed as to uphold it." 2013-NMSC-037, ¶ 11 (text only) (citation omitted).

**F.      Intermediate Scrutiny Is the Proper Level of Scrutiny for Adjudication of a Partisan Gerrymandering Claim Under Article II, Section 18**

{56}     Balancing the competing constitutional interests involved, we determine that intermediate scrutiny is the proper level of scrutiny for a partisan gerrymandering claim under Article II, Section 18. Our determination is based on the nature of the restricted right rather than on the legislative classification involved, which the Real Parties concede cannot invoke strict scrutiny. *See Breen*, 2005-NMSC-028, ¶ 12 ("Only legislation that affects the exercise of a fundamental right or a suspect classification such as race or ancestry will be subject to strict scrutiny." (internal quotation marks and citation omitted)). "The determination of which level of scrutiny is applicable under the Constitution is a purely legal question, and is reviewed de novo." *Id.* ¶ 15.

{57}     "Under . . . the New Mexico Constitution, there are three standards of review that this Court uses when reviewing equal protection claims: strict scrutiny;

41

intermediate scrutiny; and the rational basis test." *State v. Ortiz*, 2021-NMSC-029, ¶ 27, 498 P.3d 264 (text only) (citation omitted). As we explained in *Marrujo*:

> Strict scrutiny applies when the violated interest is a fundamental personal right or civil liberty—such as . . . voting . . .—which the Constitution explicitly or implicitly guarantees. . . . Under this analysis the burden is placed upon the state to show that the restriction of a fundamental right . . . supports a compelling state interest, and that the legislation accomplishes its purposes by the least restrictive means. Otherwise the statute will be invalidated. . . .

> [Intermediate] scrutiny is triggered by . . . [l]egislation that impinges upon an important—rather than fundamental—individual interest[.] . . . This level of evaluation is more sensitive to the risks of injustice than the rational basis standard and yet less blind to the needs of governmental flexibility than strict scrutiny. The burden is on the party maintaining the statute's validity—the state—to prove that the classification is substantially related to an important governmental interest.

> The rational basis standard of review is triggered by all other interests.

1994-NMSC-116, ¶¶ 10-12 (internal quotation marks and citations omitted).

{58}    The right to vote being fundamental, we do not consider the rational basis test here, regardless of the importance of the governmental interest in redistricting. Thus, we explain why intermediate scrutiny, rather than strict scrutiny, is the proper level of scrutiny for a partisan gerrymandering claim under the New Mexico Equal Protection Clause.

42

**{59}** As previously discussed, we recognize the right to vote as "a fundamental personal right or civil liberty," which ordinarily would warrant strict scrutiny. *Marrujo*, 1994-NMSC-116, ¶ 10; *see Torres v. Village of Capitan*, 1978-NMSC-065, ¶ 23, 92 N.M. 64, 582 P.2d 1277 (quoting *Reynolds*, 377 U.S. at 562) (noting that voting rights are "'fundamental interests' that must be subjected to the strictest standard"); *see also Richardson v. Carnegie Library Restaurant, Inc.*, 1988-NMSC-084, ¶ 31, 107 N.M. 688, 763 P.2d 1153 ("'The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's fundamental rights may not be submitted to vote; they depend on the outcome of no elections.'" (ellipsis omitted) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943))), *overruled on other grounds by Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 36, 125 N.M. 721, 965 P.2d 305. We have also said that "[t]he nature of the individual interest and of the legislative classification determines the appropriate level of scrutiny, not the importance of the government's goal or the vagaries of history." *Trujillo v. City of Albuquerque*, 1990-NMSC-083, ¶ 19, 110 N.M. 621, 798 P.2d 571, *overruled on other grounds*, 1998-NMSC-031, ¶ 36.

{60} However, we also recognize the Legislature's constitutional responsibility for redistricting under Article IV, Section 3 of the New Mexico Constitution. The importance of such a responsibility eclipses that of a statutory goal and counsels against strict scrutiny. *See Trujillo*, 1990-NMSC-083, ¶ 21 (recognizing "the nearly fatal invocation of strict scrutiny" for challenged legislation (internal quotation marks and citation omitted)); *see also Richardson*, 1988-NMSC-084, ¶ 31 ("Strict scrutiny has operated as an antimajoritarian safeguard. Accordingly, the application of the strict scrutiny test has resulted in the virtual immunization of certain liberties from legislative affliction.").

{61} Critically, strict scrutiny entails the least restrictive means analysis, which would render vulnerable a legislative districting plan involving any degree of partisan gerrymander. To hold the state to a least restrictive means requirement in redistricting where some degree of partisan gerrymander is constitutionally permissible would be unreasonable and contradictory. *Cf. Torres*, 1978-NMSC-065, ¶ 22 ("Great latitude must of necessity be accorded the discretionary acts of the legislature, and every reasonable presumption in favor of the validity of its action must be indulged.").

{62} Instead, under intermediate scrutiny a court applies a *less* restrictive means analysis, thereby "allowing for a more flexible accommodation of legislative

44

purposes . . . [while] not abandon[ing] totally the concern with over- and under-inclusiveness that, under strict scrutiny, is given form as the *least* restrictive alternative test." *Trujillo*, 1990-NMSC-083, ¶ 28 (emphasis added). The *less* restrictive means test abides with the "hallmark" of intermediate scrutiny to "assess[] the importance of the state interest by balancing it against the burdens imposed on the individual and on society." *Id.* ¶ 29 ("[A] state's interest in preserving limited educational funds for legal residents did not justify statute's burden on the interests of children of [undocumented immigrants]." (*citing Plyler v. Doe*, 457 U.S. 202 (1982))). "While the *least restrictive alternative* need not be selected if it poses serious practical difficulties in implementation, the existence of *less restrictive alternatives* is material to the determination of whether the classification substantially furthers an important governmental interest." *Id.* ¶ 30. Such balancing of interests abides with the objective of the Kagan test to apply a "standard [that] invalidates the most [egregious], but only the most [egregious], partisan gerrymanders." *Rucho*, 139 S. Ct. at 2516 (Kagan, J., dissenting).

{63}    Under the foregoing considerations, we hold that intermediate scrutiny properly balances the competing constitutional interests of a partisan gerrymandering claim. "Therefore, when applying intermediate scrutiny, [a c]ourt must examine (1) the governmental interests served by the [restriction of the right

affected], and (2) whether the [restriction of the right affected] under the statute bear[s] a substantial relationship to any such important interests. The burden is on the party supporting the legislation's constitutionality." *Breen*, 2005-NMSC-028, ¶ 30 (internal quotation marks and citation omitted).

**G.     While All Relevant Evidence May Be Considered by the District Court in a Partisan Gerrymandering Claim, the District Court Shall Consider and Address Evidence of Packing or Cracking Relating to an Individual Plaintiff's Own District**

{64}     In applying the Kagan test within a partisan gerrymandering claim, a district court may consider all evidence relevant to whether the challenged legislation seeks to effect political entrenchment through intentional and substantial vote dilution. To satisfy the effects prong, however, a plaintiff must provide sufficient evidence that the plaintiff's own district was either *packed* or *cracked*, depending on the allegations, and that the resultant dilution of the plaintiff's vote is substantial. *Cf. Rucho*, 139 S. Ct. at 2492 ("[A] plaintiff asserting a partisan gerrymandering claim based on a theory of vote dilution must establish standing by showing he lives in an allegedly 'cracked' or 'packed' district." (quoting the unanimous holding in *Gill*, 138 S. Ct. at 1931)). For a district court to find a violation of Article II, Section 18, such district-specific evidence of disparate treatment should be as objective as possible, for example, by comparing voter registration percentages or data for the political party affiliation of the individual plaintiffs under the prior districting map

46

against parallel percentages or data under the challenged districting map. Further, a district court adjudicating a partisan gerrymandering claim must determine whether the evidence shows the challenged redistricting map substantially diluted the votes of plaintiffs within their district, though statewide evidence may also be relevant.[12]

[12]In *Gill*, the United States Supreme Court articulated propositions that we find persuasive of our conclusions above, albeit in the context of establishing Article III standing. First, the *Gill* Court recognized the well-established proposition "that a person's right to vote is 'individual and personal in nature.'" 138 S. Ct. at 1929 (quoting *Reynolds*, 377 U.S. at 561). Next, "[t]o the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific. . . . The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked." *Id.* at 1930. Finally, *Gill* invoked the reasoning of racial and one-person, one-vote gerrymandering jurisprudence in analyzing the nature of constitutional harm and remedy under a partisan gerrymandering claim. *See id.* at 1930-31.

In the same vein, we also note Justice Kagan's related discussion in her concurrence in *Gill*:

> The harm of vote dilution, as this Court has long stated, is individual and personal in nature. It arises when an election practice—most commonly, the drawing of district lines—devalues one citizen's vote as compared to others. Of course, such practices invariably affect more than one citizen at a time. For example, our original one-person, one-vote cases considered how malapportioned maps contracted the value of urban citizens' votes while expanding the value of rural citizens' votes. But we understood the injury as giving diminished weight to each particular vote, even if millions were so touched. In such cases, a voter living in an overpopulated district suffered disadvantage to herself as an individual: Her vote counted for less than the votes of other citizens in her State. And that kind of disadvantage is what a plaintiff asserting a vote dilution claim—in the one-person, one-vote context or any other—always alleges.

138 S. Ct. at 1935 (Kagan, J., concurring) (text only) (citations omitted).

47

*See Gill*, 138 S. Ct. at 1929-31; *see also Rucho*, 139 S. Ct. at 2516 (Kagan, J., dissenting).

{65}    We find a useful evidentiary template in *Rucho*, where extensive evidence of intent and effect indicated that the districting plans in North Carolina and Maryland were "highly partisan, by any measure." 139 S. Ct. at 2491. This record in *Rucho* supports that many forms of evidence may be relevant to prove predominant intent and substantial effect for an egregious partisan gerrymander. Regarding the effects prong of the Kagan test, we reiterate that evidence of substantial dilution of plaintiffs' votes must rely on objective district-specific evidence.[13] We point to the evidence in *Rucho* as guidance to the district court, not as limitation on what other relevant evidence may be considered.

{66}    Regarding the Kagan test's third prong of causation, we reiterate that "if the plaintiffs make those showings [of intent and effects], the State must come up with a legitimate, non-partisan justification to save its map." *Id.* at 2516 (Kagan, J., dissenting).

---

[13]By way of example, we note the voter registration evidence from Maryland's Sixth Congressional District, which offers a stark before-and-after comparison of registered Republican voters dropping from 47% under the prior map to 33% under the challenged map. *Rucho*, 139 S. Ct. at 2519 (Kagan, J., dissenting).

{67} We conclude by emphasizing that the touchstone of an egregious partisan gerrymander under Article II, Section 18 is political entrenchment through intentional dilution of individuals' votes, thereby invoking the protections of Article II, Sections 2, 3, and 8. In an egregious partisan gerrymandering claim, evidence of disparate treatment sufficient to establish a violation of the New Mexico Equal Protection Clause must prove under intermediate scrutiny that the predominant purpose underlying a challenged map was to entrench the redistricting political party in power through vote dilution of a rival party; that individual plaintiffs' rival-party votes were in fact substantially diluted by the challenged map; and, upon those showings, that the State cannot demonstrate a legitimate, nonpartisan justification for the challenged map.

{68} **IT IS SO ORDERED.**

**C. SHANNON BACON, Chief Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Justice**

**DAVID K. THOMSON, Justice**

49

_____

**JULIE J. VARGAS, Justice**


_____

**BRIANA H. ZAMORA, Justice**

50